IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                     No. CR 19-2846 JB

EZ GARCIA,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Objections to PSR, filed April 27, 2020 (Doc. 42)("Objections").  The primary issues are: (i) whether the Court should apply United States Guidelines Manual ("U.S.S.G." or "Guidelines") § 3A1.1(b)(1), which provides a 2-level sentencing enhancement for crimes involving unusually vulnerable victims, to Defendant EZ Garcia, because he severely assaulted Jane Doe, his eighty-six-year-old grandmother, with her cane, but did so while he was heavily inebriated; (ii) whether the Court should impose sex offender treatment as a condition of Garcia's supervised release, because he was convicted of a sex crime in 2008, when he was a juvenile, despite Garcia's argument that there is no nexus between the 2008 offense and this federal offense for which he is being sentenced, which is not a sex crime; (iii) whether the Court should forbid contact between Garcia and his grandmother, the victim, without the United States Probation Office's ("USPO") approval  as a condition of Garcia's supervised release, over Garcia's Objection that such a condition deprives him of a fundamental right to familial association and that this condition impermissibly delegates punishment to the USPO; (iv) whether the Court should require that Garcia spend six months at a halfway house as a condition of his supervised release over Garcia's Objection that such a condition is unnecessary;

and (v) whether the Presentence Investigation Report, filed March 25, 2020 (Doc. 40), errs in assigning Doe's extended humerus bone as a wound from Garcia's assault and not as a preexisting condition.  The Court concludes that: (i) U.S.S.G. § 3A1.1(b)(1)'s vulnerable-victim enhancement applies, because Garcia's use of Doe's cane, on which she relies to walk, rendered her unusually vulnerable to Garcia's assault; (ii) the Court will not impose sex offender treatment as a condition of Garcia's supervised release, because the earlier sexual offense happened when Garcia was a juvenile, he has committed no similar crimes since the earlier offense, and there is insufficient nexus between the earlier offense and this offense; (iii) the Court will prohibit contact between Garcia and Doe absent USPO approval, and the no-contact order does not impermissibly delegate punishment to the USPO, because the Court instructs the USPO to liberally consent to contact, provided that Doe consents and Garcia complies with his supervised release conditions; (iv) the Court will require that Garcia stay at a halfway house as a condition of his supervised release, because this condition is reasonably necessary to protect the public, prevent crime, and promote Garcia's rehabilitation; and (v) the PSR errs in assigning Doe's extended humerus as a resulting injury, because the Court cannot conclude by a preponderance of the evidence that Garcia's assault caused Doe's humerus bones to be unequal in size.  Accordingly, the Court sustains in part and overrules in part Garcia's Objections.

## FACTUAL BACKGROUND

Garcia pled guilty to a 1-count Indictment, filed August 27, 2019 (Doc. 18), on January 28, 2020.  See Plea Agreement at 4, filed January 28, 2020 (Doc. 36).  The Indictment charges that, on or about June 10, 2019, in Indian Country, Garcia, an Indian, "assaulted Jane Doe, and the assault resulted in serious bodily injury."  Indictment at 1.  In his Plea Agreement, Garcia declares the following facts true under penalty of perjury:

- 2 -

I, EZ Garcia. an Indian and enrolled member of the Navajo Nation. assaulted Jane Doe and caused serious bodily injury.  Specifically, on or about June 10, 2019, I used Jane Doe's cane to hit her over the head and arms multiple times.  At the time of the incident, I was extremely intoxicated and blacked out.  I later learned that I caused serious bodily injury to Jane Doe, including extreme physical pain rated as a 10 out of 10 by Jane Doe, multiple injuries requiring medical intervention including lacerations to Jane Doe's face and arms, contusions and swelling to her arm, and a concussion.  The incident occurred within the exterior boundaries of the Navajo Reservation, in the District of New Mexico.

Plea Agreement ¶ 7, at 4.  By signing the Plea Agreement, Garcia "agrees that the Court may rely on any of these facts, as well as facts in the presentence report, to determine the Defendant's sentence[.]"  Plea Agreement ¶ 8, at 4.

The PSR expounds on these facts by providing:

11.    On June 10, 2019, at approximately 8:00 pm, the [Ramah Navajo Police Department ("RNPD")] was notified that an elderly female was being taken to the Pine Hill clinic for medical treatment.  The elderly female was identified as E.B., hereinafter referred to as Jane Doe, year of birth 1933.

12.    Jane Doe was transported from the Pine Hill clinic to Gallup Indian Medical Center (GIMC) in Gallup, New Mexico by Pine Hill Emergency Medical Service (EMS).  Jane Doe told Pine Hill EMS emergency medical technicians that she was sitting on her bed when her grandson, Ez Garcia, took her cane from her and began hitting her.  Jane Doe was unable to defend herself from the attack.  Progress notes from GIMC state that Jane Doe suffered from at least six lacerations along her frontal forehead.  Jane Doe also suffered from lacerations to her left mid-forearm and left hand.

13.    Jane Doe was interviewed by the FBI and [RNPD] on June 11, 2019.  The interview was conducted in Navajo.  During the interview, Jane Doe stated she was on her bed in her bedroom on June 10, 2019. Garcia came into Jane Doe's bedroom, grabbed Jane Doe's walking cane, and hit Jane Doe multiple times on her head with the cane.  Garcia also hit Jane Doe on her arms.  Garcia then dragged Jane Doe by her arm from her bedroom to the sofa in the family room.  Jane Doe and Garcia both sat on the sofa.  Garcia was intoxicated.  After Garcia fell asleep on the sofa, Jane Doe, an 85-year-old female, walked approximately 200 yards through the woods to seek help.  A passerby on the road stopped and helped Jane Doe into her vehicle.  The passerby drove Jane Doe to the Pine Hill clinic for medical treatment.

. . . .

- 3 -

18.     According to Pine Hill Health Center medical records, Jane Doe was ambulatory, and she was walking with a female that had picked her up by the roadside.  Jane Doe had dried blood on her shirt, and spots of blood on her skirt. Jane Doe had multiple lacerations to her head, a laceration to left arm, and avulsions (tearing of the skin) to both hands.  Several of the wounds were not actively bleeding, but the head wounds were slightly bleeding, venous (relating to veins). Listing and severity of wounds are as follows:

- Full thickness laceration to left front side of face approximately six cm in length from forehead to lateral of nose, minimal bleeding, venous.

- Full thickness laceration to face forehead near nose approximately five cm in length, from medial forehead contacting first laceration at an angle minimal bleeding, venous.

- Laceration to top of head partial thickness, approximately three cm.

- Left eye completely swollen shut.

- Left forearm six cm laceration full thickness, not actively bleeding, soft tissue exposed.

- Left wrist avulsion approximately three cm in diameter, not actively bleeding.

- Right hand avulsion approximately three cm in diameter, not actively bleeding.

- Left head of humerus (bone in arm that runs from shoulder to elbow) and joint not equal to right.

- Several contusions to left forearm.

. . . .

20.     In summary, on June 10, 2019, Garcia who was under the influence of alcohol, assaulted Jane Doe, Garcia's grandmother, multiple times in the head, face, and arms using Jane Doe's cane as a weapon. Jane Doe went to the hospital and required medical attention including surgery, which resulted in serious bodily injury.  Jane Doe is unusually vulnerable due to her being 86 years old at the time of the instant offense.  In addition, Garcia physically restrained Jane Doe when he dragged her by her arm from her bedroom to the sofa in the family room.

- 4 -

PSR ¶¶ 11-20, at 4-7.  Garcia objects to the PSR's stated facts only as to the PSR's attribution of Doe's humerus to Garcia's assault.  See Objections at 5.

The PSR applies a base offense level of 14 under U.S.S.G. § 2A2.2(a).  See PSR ¶ 26, at 7. The PSR adds two specific offense adjustments -- use of a dangerous weapon and resulting serious bodily injury -- under U.S.S.G. § 2A2.2(b)(2)(B) and (b)(3)(B).  See PSR ¶¶ 27-28, at 7.  The PSR also adds two victim-related adjustments for vulnerable victim and restraint of victim.  See PSR ¶¶ 29-30, at 7 (citing U.S.S.G. §§ 3A1.3 and §3A1.1(b)(1)).  The PSR then decreases the overall offense level by three levels for Garcia's acceptance of responsibility and assistance to authorities. See PSR ¶¶ 35-36, at 8.  The PSR provides an overall offense level of 24 and a criminal history category of II, based on Garcia's abusive sexual contact with a minor family member when he was a juvenile.  See PSR ¶¶ 40-41, at 8-10.  The PSR calculates a Guidelines imprisonment range of 57-71 months.  See PSR ¶ 115, at 27.  The PSR recommends that the Court impose sex offender treatment and a six-month halfway house residency as special conditions of Garcia's supervised release.  See PSR ¶ 121, at 28; Attachment A to the Presentence Report at 3, filed March 25, 2020 (Doc. 40-1)("Bruce Memo").[1]  The USPO further recommends that the Court prohibit Garcia from interacting with his victim for one to thee years, his supervised release's duration.  See Bruce Memo at 3.  Garcia objects to the 2-level vulnerable-victim enhancement, the sex offender treatment, the halfway house requirement, the no-contact order, and the attribution of Doe's extended humerus to Garcia's assault.  See Objections at 1-14.

_____

[1]In the District of New Mexico, the USPO prepares and delivers a Bruce Memo, named after the United States Court of Appeals for the Tenth Circuit's case of United States v. Bruce, 458 F.3d 1157 (10th Cir. 2006)(Murphy, J.), before sentencing and before violations hearings. The Bruce Memo lists all conditions -- mandatory, standard, and special -- that the Court is thinking of imposing, so the parties know in advance what the Court is considering and can prepare.

- 5 -

## LAW REGARDING THE VULNERABLE VICTIM ADJUSTMENT

The vulnerable victim adjustment, U.S.S.G. § 3A1.1(b), provides:

(b)(1)  If the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by **2** levels.

(2)        If (A) subdivision (1) applies; and (B) the offense involved a large number of vulnerable victims, increase the offense level determined under subdivision (1) by **2** additional levels.

U.S.S.G. § 3A1.1(b)(1) (bold in original).  Application Note 2 to U.S.S.G. § 3A1.1 explains:

For purposes of subsection (b), **"vulnerable victim"** means a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct.

Subsection (b) applies to offenses involving an unusually vulnerable victim in which the defendant knows or should have known of the victim's unusual vulnerability.  The adjustment would apply, for example, in a fraud case in which the defendant marketed an ineffective cancer cure or in a robbery in which the defendant selected a handicapped victim.  But it would not apply in a case in which the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile.  Similarly, for example, a bank teller is not an unusually vulnerable victim solely by virtue of the teller's position in a bank.

Do not apply subsection (b) if the factor that makes the person a vulnerable victim is incorporated by the offense guideline.  For example, if the offense guideline provides an enhancement for the age of the victim, this subsection would not be applied unless the victim was unusually vulnerable for reasons unrelated to age.

U.S.S.G. § 3A1.1 Application Note 2 (bold in original).  "In order to classify a victim as 'vulnerable,' 'the sentencing court must make particularized findings of vulnerability.'"  United States v. Brunson, 54 F.3d 673, 676 (10th Cir. 1995)(quoting United States v. Lee, 973 F.2d 832, 834 (10th Cir. 1992)).  "The focus of the inquiry must be on the 'victim's personal or individual vulnerability.'"  United States v. Brunson, 54 F.3d at 676 (quoting United States v. Lee, 973 F.2d at 835).

"'[V]ulnerable victims' are those who are in need of greater societal protection." United States v. Brunson, 54 F.3d 673, 676 (10th Cir. 1995). "Specifically, the enhancement should apply when the victim is 'less able to resist than the typical victim.'" United States v. Scott, 529 F.3d 1290, 1300 (10th Cir. 2008)(quoting United States v. Castaneda, 239 F.3d 978, 980 (9th Cir. 2001)). "Moreover, the vulnerable-victim enhancement cannot be based solely on the victim's membership in a certain class; the sentencing court is required to make particularized findings of vulnerability, focusing on the individual victim and not the class of persons to which the victim belonged." United States v. Smith, 133 F.3d at 749.

In United States v. Janusz, 135 F.3d 1319 (10th Cir. 1998), the United States Court of Appeals for the Tenth Circuit held that an enhancement under U.S.S.G. § 3A1.1 was appropriate. See 135 F.3d at 1325. The enhancement was appropriate, because the sentencing court "made specific findings as to the vulnerability of both [of the victims]. [One victim] was bedridden, unable to tend for himself, sick and extremely vulnerable." United States v. Janusz, 135 F.3d at 1325 (internal quotation marks omitted). The other victim "was confused about many things, very susceptible to suggestion from anyone, including the defendant [and] . . . was extremely trusting in many respects." United States v. Janusz, 135 F.3d at 1325 (internal quotation marks omitted). The enhancement was also appropriate, because the sentencing court "found a nexus between [the victims]' vulnerability and the commission of the crimes." United States v. Janusz, 135 F.3d at 1325. The Tenth Circuit commented:

> It would be difficult, indeed, to imagine a stronger nexus. The evidence indicate[d that the defendant] recognized [the victims]' age, wealth, and diminished physical capacity, and believing they would both soon die . . . devised a scheme to separate them from their money by making loans which he would collect for himself after their death.

United States v. Janusz, 135 F.3d at 1325 (citations omitted).  The Tenth Circuit provides that the vulnerable-victim enhancement is warranted where "the defendant selected and targeted this particular victim for the [offense] because of unusual characteristics."  United States v. Pearce, 967 F.2d 434, 435 (10th Cir. 1992)(Tacha, J.).  The vulnerable-victim enhancement, however, "does not require a finding that the defendant targeted the victim because of the victim's vulnerability."  United States v. Checora, 175 F.3d 782, 789 n.4 (10th Cir. 1999).  See United States v. Smith, 133 F.3d 737, 749 (10th Cir. 1997); United States v. Hardesty, 105 F.3d 558, 560-61 (10th Cir. 1997).

## LAW REGARDING SUPERVISED RELEASE

A district court's decision making with regard to violations of supervised release conditions comes in two phases.  First, at sentencing, the court must decide whether to impose a term of supervised release and, if so, how long a term to impose and what conditions to associate with it. Second, while the defendant is on supervised release, if the United States accuses the defendant of violating a condition of supervised release, the Court must determine whether the defendant has violated the condition, whether to revoke supervised release, and, if so, what disposition to impose for the violation.  See United States v. Lee, 147 F. Supp. 3d 1253 (D.N.M. 2015)(Browning, J.), aff'd 650 F. App'x 948 (10th Cir. 2016)(holding that the district court did not error by considering the need for a sentence to reflect the seriousness of the offense -- a sentencing factor not expressly cross-referenced in the revocation sentencing statute).[2]

---

[2]In United States v. Thompson, 777 F.3d 368 (7th Cir. 2015), the Honorable Richard Posner, United States Circuit Judge for the United States Court of Appeals for the Seventh Circuit, criticizes the manner in which district courts regularly impose conditions of supervised release. Judge Posner asserts, among other things, that: (i) defendants often are not given advance notice of the conditions of supervised release that a judge is thinking about imposing; and (ii) many judges fail to explain their reasoning for imposing conditions of supervised release, and do not apply the

eight 18 U.S.C. § 3553(a) factors, referenced in § 3583(c), to proposed conditions.  See 777 F.3d at 371-74.

      If Judge Posner is at war with supervised release overall -- and does not think federal courts should be imposing it at all -- the Court may share some of his concerns.  The Court believes that much of what is done on supervised release is law enforcement work and detracts from the federal courts' primary function of adjudicating cases.  The Court is often put in the position of talking to probation officers outside the presence of parties, receiving information about the defendant, approving petitions, and then presiding as judge.  Whether a defendant is using alcohol or where the defendant is living or working -- after he or she has been released from prison -- could be supervised by the Bureau of Prisons just as well or better than this Court, and parole officers are correctional officers in many states, including in New Mexico.

      Supervision of a long criminal docket like in New Mexico is extremely time-and-resource consuming, taking time from traditional judicial functions -- like deciding new cases -- and requiring judges to monitor conditions of supervised release sometimes imposed years or decades earlier.  Nevertheless, supervised release remains immensely popular in the political branches, and Congress generously funds the U.S.P.O. and its work.  See Administrative Office Of The U.S. Courts, Federal Corrections And Supervision Division, The U.S. Probation And Pretrial Services System at 1 (2001), www.ilnpt.uscourts.gov/Probation_and_Pretrial_System.pdf.  As long as the political branches want the service, the Court must defer to the political branches' expression of the popular will and faithfully perform its delegated function.  Thus, Judge Posner's war on supervised release must be tempered with the recognition that Congress wants district courts to supervise defendants.  And he cannot make it unworkable.  The sentencing cannot become a negotiation process that produces a contract resembling one between Microsoft and a software user, with every word defined.  While the Court often revises the conditions to make them clearer and tailored to the case, the defendant and counsel have to help spot problems; it remains an adversarial process, and the Court has to rely on the attorneys telling it what could be a problem in the particular case before the Court.

      The District and the Court already follow some of Judge Posner's directives, but when parties know in advance what the Court is thinking, and do not object to the wording of a condition, it is an undue burden for the Court to independently review each condition and justify on the record each condition -- mandatory and standard -- on the record at the hearing.  If the Court discloses in advance all conditions and justifies on the record each special condition, that careful approval is enough to satisfy Tenth Circuit law and should be enough to satisfy any notion of basic fairness to the defendant, without making the sentencing hearing unduly long or complicated.  See United States v. Bruce, 458 F.3d at 1166-69 (holding that pre-hearing "notice of a special condition is required only where the condition implicate[s] a liberty interest, and there [is] a lack of any obvious nexus between the condition and the crime of conviction." (internal quotation marks omitted)); United States v. Martinez-Torres, 795 F.3d 1233, 1237-38 (10th Cir. 2015)(Hartz, J.)(holding that, before imposing a special condition, the district court must make an individualized assessment and explain why it is imposing the condition with a statement of "generalized reasons").

- 9 -

1.      **Imposition of Supervised Release.**

A court, "in imposing a sentence to a term of imprisonment for a felony or a misdemeanor, may [and sometimes must] include as a part of the sentence a requirement that the defendant be placed on a term of supervised release after imprisonment."  18 U.S.C. § 3583(a).  As part of a defendant's supervised release, he is legally bound to abide by certain conditions of his release. See 18 U.S.C. § 3583(d).  Section 3583 of Title 18 of the United States Code lists some of the standard and discretionary conditions that courts must

and may impose as part of supervised release:

> Conditions of supervised release -- The court shall order, as an explicit condition of supervised release, that the defendant not commit another Federal, State, or local crime during the term of supervision and that the defendant not unlawfully possess a controlled substance.  The court shall order as an explicit condition of supervised release for a defendant convicted for the first time of a domestic violence crime as defined in section 3561(b) that the defendant attend a public, private, or private nonprofit offender rehabilitation program that has been approved by the court, in consultation with a State Coalition Against Domestic Violence or other appropriate experts, if an approved program is readily available within a 50-mile radius of the legal residence of the defendant.  The court shall order, as an explicit condition of supervised release for a person required to register under the Sex Offender Registration and Notification Act, that the person comply with the requirements of that Act.  The court shall order, as an explicit condition of supervised release, that the defendant cooperate in the collection of a DNA sample from the defendant, if the collection of such a sample is authorized pursuant to section 3 of the DNA Analysis Backlog Elimination Act of 2000.  The court shall also order, as an explicit condition of supervised release, that the defendant refrain from any unlawful use of a controlled substance and submit to a drug test within 15 days of release on supervised release and at least 2 periodic drug tests thereafter (as determined by the court) for use of a controlled substance.  The condition stated in the preceding sentence may be ameliorated or suspended by the court as provided in section 3563(a)(4).  The results of a drug test administered in accordance with the preceding subsection shall be subject to confirmation only if the results are positive, the defendant is subject to possible imprisonment for such failure, and either the defendant denies the accuracy of such test or there is some other reason to question the results of the test.  A drug test confirmation shall be a urine drug test confirmed using gas chromatography/mass spectrometry techniques or such test as the Director of the Administrative Office of the United States Courts after consultation with the Secretary of Health and Human Services may determine to be

of equivalent accuracy.  The court shall consider whether the availability of appropriate substance abuse treatment programs, or an individual's current or past participation in such programs, warrants an exception in accordance with United States Sentencing Commission guidelines from the rule of section 3583(g) when considering any action against a defendant who fails a drug test.  The court may order, as a further condition of supervised release, to the extent that such condition --

    (1)    is reasonably related to the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D);

    (2)    involves no greater deprivation of liberty than is reasonably necessary for the purposes set forth in section 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D); and

    (3)    is consistent with any pertinent policy statements issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a);

any condition set forth as a discretionary condition of probation in section 3563(b) and any other condition it considers to be appropriate, provided, however that a condition set forth in subsection 3563(b)(10) shall be imposed only for a violation of a condition of supervised release in accordance with section 3583(e)(2) and only when facilities are available.  If an alien defendant is subject to deportation, the court may provide, as a condition of supervised release, that he be deported and remain outside the United States, and may order that he be delivered to a duly authorized immigration official for such deportation.  The court may order, as an explicit condition of supervised release for a person who is a felon and required to register under the Sex Offender Registration and Notification Act, that the person submit his person, and any property, house, residence, vehicle, papers, computer, other electronic communications or data storage devices or media, and effects to search at any time, with or without a warrant, by any law enforcement or probation officer with reasonable suspicion concerning a violation of a condition of supervised release or unlawful conduct by the person, and by any probation officer in the lawful discharge of the officer's supervision functions.

18 U.S.C. § 3583(d).

Thus, § 3583 specifies standard and discretionary conditions of supervised release, while elsewhere Congress has provided for other conduct which, if committed by a defendant on supervised release, can result in a revocation of supervised release.  Among others, § 3583 requires that the defendant not commit another federal, state, or local crime during the term of supervision,

that the defendant not possess any controlled substances, and that the defendant cooperate in the collection of a DNA sample.  See 18 U.S.C. § 3583(d).  Further, § 3583 permits a court to craft special conditions of supervised release that it deems appropriate.  See 18 U.S.C. § 3583(d). Among those conditions not listed in § 3583 is that supervised release may be revoked if the defendant fails to pay a fine or restitution that the court has imposed.  See 18 U.S.C. § 3613A ("Upon a finding that the defendant is in default on a payment of a fine or restitution, the court may, pursuant to section 3565, revoke probation or a term of supervised release").

In "determining whether to include a term of supervised release, and if a term of supervised release is to be included, in determining the length of the term and the conditions of supervised release," the court "shall consider the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7)."  18 U.S.C. § 3583(c).

## 2.    Revocation of Supervised Release.

Subsection (e)(3) of § 3583 sets forth the process for revoking supervised release:

(e)    Modification of conditions or revocation. -- The court may, after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7) --

. . . .

(3)    revoke a term of supervised release, and require the defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release without credit for time previously served on postrelease supervision, if the court, pursuant to the Federal Rules of Criminal Procedure applicable to revocation of probation or supervised release, finds by a preponderance of the evidence that the defendant violated a condition of supervised release, except that a defendant whose term is revoked under this paragraph may not be required to serve on any such revocation more than 5 years in prison if the offense that resulted in the term of supervised release is a class A felony, more than 3 years in prison if such offense is a class B

> felony, more than 2 years in prison if such offense is a class C or D
> felony, or more than one year in any other case . . . .

18 U.S.C. § 3583(e).  Further, under § 3583(h), "[w]hen a term of supervised release is revoked and the defendant is required to serve a term of imprisonment, the court may include a requirement that the defendant be placed on a term of supervised release after imprisonment."  18 U.S.C. § 3583(h).  See Johnson v. United States, 529 U.S. 694, 712-13 (2000)(holding that, even before the addition of Subsection (h) to the statute in 1994, a plain reading of Subsection (e)(3) authorized district courts to order terms of supervised release following reimprisonment).  The court must find all violations of supervised release by a preponderance of the evidence, regardless whether the violative conduct itself constitutes criminal conduct.  See 18 U.S.C. § 3583(e).  This standard is different from the ones that apply to a defendant's violation of supervised release conditions pending trial -- mere probable cause for criminal violations, and the clear-and-convincing standard for noncriminal violations.  See 18 U.S.C. § 3148(b)(1).

### 3.    Sentencing Following the Revocation of Supervised Release.

Consistent with § 3583(e)(2), the Tenth Circuit has explained: "When a convicted defendant violates a condition of supervised release, the sentencing judge may revoke the term of supervised release and impose prison time."  United States v. Patton, 506 F. App'x 729, 731 (10th Cir. 2012)[3](Brorby, J.)(quoting United States v. Vigil, 696 F.3d 997, 1002 (10th Cir.

---

[3]United States v. Patton is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value

2012)(O'Brien, J.)(citing 18 U.S.C. § 3584(e))).[4]  In doing so, "[t]he judge must consider [certain] factors in 18 U.S.C. § 3553(a) and the policy statements in Chapter 7 of the Sentencing Guidelines."  United States v. Patton, 506 F. App'x at 731 (brackets in original).  See 18 U.S.C. § 3583(e).  The relevant portion of 18 U.S.C. § 3583(e) concerning revocation of supervised release provides that "[t]he court may, after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7) . . . revoke a term of supervised release, and require the defendant to serve in prison all or part of the term of supervised release."  18 U.S.C. § 3583(e).  The eight relevant § 3553(a) factors are as follows:

> (1)  the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2)  the need for the sentence imposed --
>
> . . . .
>
> > (B)  to afford adequate deterrence to criminal conduct;

---

with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds that United States v. Patton, United States v. Joe, 785 F. App'x 528 (10th Cir. 2019); United States v. Woolsey, 606 F. App'x 454 (10th Cir. 2015); United States v. Ceballos-Silva, No. 11-10275, 2011 WL 6217935 (5th Cir. Dec. 14, 2011); and Suasnavas v. Stover, 196 F. App'x 647 (10th Cir. 2006), all have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

[4]Under § 3583(h), "[w]hen a term of supervised release is revoked and the defendant is required to serve a term of imprisonment, the court may include a requirement that the defendant be placed on a term of supervised release after imprisonment."  18 U.S.C. § 3583(h).  See Johnson v. United States, 529 U.S. at 712-13 (holding that, even before the addition of Subsection (h) to the statute in 1994, a plain reading of Subsection (e)(3) authorized district courts to order terms of supervised release following reimprisonment).  When a defendant violates conditions of his supervised release, therefore, he can be sentenced to imprisonment followed by further supervised release.

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

. . . .

(4)    the kinds of sentence and the sentencing range established for --

. . . .

(B)    in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

(5)    any pertinent policy statement --

(A)    issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(B)    that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

(6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)    the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).  See United States v. Patton, 506 F. App'x at 731 n.2 (explaining that 18

U.S.C. § 3583(e) lists the § 3553(a) factors to be considered).

In particular, a district court must consider the policy statements in Chapter 7 of the Sentencing Guidelines before imposing a sentence for violations of the conditions of supervised release.  See United States v. Vigil, 696 F.3d at 1002; United States v. Kelley, 359 F.3d 1302, 1304-05 (10th Cir. 2004)(Ebel, J.).  The Guidelines' commentary is generally an authoritative interpretation of the rules contained therein.  See Stinson v. United States, 508 U.S. 36, 38 (1993). "[T]he Chapter 7 provisions dealing with violations of supervised release are not mandatory sentencing guidelines; rather, they merely constitute advisory policy statements."  United States v. Vigil, 696 F.3d at 1002 (quoting United States v. Contreras-Martinez, 409 F.3d 1236, 1240 (10th Cir. 2005)(Seymour, J.)(citations and internal quotation marks omitted)).  See United States v. Hurst, 78 F.3d 482, 483 (10th Cir. 1996)(Brorby, J.)("[T]he policy statements regarding revocation of supervised release contained in Chapter 7 of the U.S.S.G.[, including U.S.S.G. § 7B1.4(a),] are advisory rather than mandatory in nature"; a sentencing court simply considers them "in its deliberations concerning punishment for violation of conditions of supervised release.")(citations and internal quotation marks omitted).

"All discussions of applicable sentences before a district court following the revocation of supervised release should be grounded in the common understanding that the district court may impose any sentence within the statutory maximum."  United States v. Vigil, 696 F.3d at 1002 (quoting United States v. Burdex, 100 F.3d 882, 885 (10th Cir. 1996)(Henry, J.)(citations and internal quotation marks omitted)).  While district courts are required to consider Chapter 7's policy statements in imposing sentences after revocation of supervised release, "[m]agic words . . . are not required to demonstrate fulfillment of this requirement."  United States v. Vigil, 696 F.3d at 1002 (quoting United States v. Tedford, 405 F.3d 1159, 1161 (10th Cir. 2005)(McKay, J.)(citations omitted)).  "Rather, it is enough if the district court considers § 3553(a)

- 16 -

en masse and states its reasons for imposing a given sentence." United States v. Penn, 601 F.3d at 1011.

## ANALYSIS

The Court sustains in part and overrules in part the Objections. The Court concludes that the 2-level vulnerable-victim enhancement applies, because Garcia knew or should have known that Doe was particularly susceptible to suffering serious injury and incapable of defending herself or fleeing when he took the cane on which she relies for walking, and used the cane to severely beat her. The Court also concludes that it will not impose sex offender treatment as a term of his supervised release, because Garcia committed his earlier sex offense more than ten years ago, and because there is insufficient evidence that Garcia's assault of Doe is similar to his prior sex offense. The Court will also prohibit Garcia from contacting Doe, the victim, during his supervised release without USPO approval. The Court concludes that compelling interests justify this no-contact order, because Doe is Garcia's victim and the Court directs USPO liberally to permit Garcia to see Doe provided that Doe consents and Garcia complies with his supervised release conditions. The Court will also require that Garcia stay at a halfway house after his release so he can get the supervision and care he needs. Finally, the Court concludes that a preponderance of the evidence does not demonstrate that Doe's uneven humerus bones resulted from the assault.

## I.   A PREPONDERANCE OF THE EVIDENCE ESTABLISHES THAT DOE IS A VULNERABLE VICTIM UNDER § 3A1.1(b)(1).

Garcia contends that the § 3A1.1(b)(1) enhancement does not apply, because Garcia was black-out drunk when he assaulted Doe and so could not have acted with knowledge of Doe's vulnerability. See Objections at 2. Garcia further argues that Doe's age and comparatively smaller stature are insufficient to render her a vulnerable victim, because Garcia avers that he did not target

Doe because of her age and size.  See Objections at 4.  Finally, Garcia notes that Doe was able to walk approximately 200 yards to seek help after Garcia assaulted her, and so Garcia argues that Doe "was not unusually physically debilitated or unusually vulnerable."  Objections at 4.

The 2-level enhancement for a vulnerable victim applies where the victim of the offense of conviction "is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct," and "the defendant knows or should have known of the victim's unusual vulnerability."  U.S.S.G. § 3A1.1 Application Note 2.  The Tenth Circuit has explained that the adjustment should apply where "the victim is *unusually* vulnerable or *particularly* susceptible to the crime committed," and where the victims "are unable to protect themselves [and] therefore require greater societal protection."  United States v. Proffit, 304 F.3d 1001, 1007 (10th Cir. 2002)(emphasis in original).  As for the defendant's requisite mental state, Courts of Appeals have long held that the defendant need not target the victim specifically because of the victim's vulnerability.  See, e.g., United States v. Checora, 175 F.3d at 789 n.4; United States v. Cruz, 106 F.3d 1134, 1139 (3d Cir. 1997); United States v. Feldman, 83 F.3d 9, 16 (1st Cir.1996).  Instead, the enhancement requires that the defendant "knew or should have known" of the victim's vulnerability.  U.S.S.G. § 3A1.1(b)(1).

Garcia focuses on both the enhancement's knowledge and vulnerability requirements.  See Objections at 2, 4.  Garcia contends that, because he was black-out drunk when he assaulted Doe, he could not have known of her vulnerability and further could not have targeted her because of her vulnerability.  See Objections at 2.  Section 3A1.1(b)(1)'s application does not, however, require that Garcia knew of Doe's vulnerability or that he targeted her because of her vulnerability. See United States v. Checora, 175 F.3d at 789 n.4.  First, § 3A1.1(b)(1) applies when the defendant "knew *or should have known*" that the victim was particularly vulnerable.  U.S.S.G. § 3A1.1(b)(1)

(emphasis added). That Garcia was very intoxicated when he assaulted Doe does not negate that he should have known of her vulnerability or that he is responsible for his intoxication level. See United States v. Luscier, 983 F.2d 1507 (9th Cir. 1993)(affirming § 3Al.1 enhancement over the defendant's argument that he was too intoxicated to realize victim was vulnerable, and holding that the defendant was responsible for his level of intoxication and should have known victim was vulnerable). The Tenth Circuit has also declined to hold that a defendant's physical or mental limitations preclude § 3A1.1(b)(1)'s application. See United States v. Joe, 785 F. App'x 528, 530 (10th Cir. 2019)(unpublished)(citing United States v. Checora, 175 F.3d at 789-90). Section 3A1.1(b)(1) envisions application to defendants who did not in fact know of their victim's vulnerability but should have known under the circumstances. See U.S.S.G. § 3A.1.1(b)(1); United States v. Checora, 175 F.3d at 789-90; United States v. Salyer, 893 F.2d 113 (6th Cir. 1989)("[D]efendant knew or should have known that the [victims] were unusually vulnerable to the threat of cross burning because they are black"). The Tenth Circuit similarly has rejected a defendant's argument that he was unaware that his victim was intoxicated -- the basis for her vulnerability -- because the victim's intoxication should have been apparent to the defendant. See United States v. Checora, 175 F.3d at 789 ("Defendants first contend they were too drunk to know that Murray was vulnerable by virtue of his intoxication. This argument misses the mark. Whether the defendants actually knew Murray was intoxicated is not necessarily dispositive."); United States v. Salemi, 26 F.3d 1084, 1087-88 (11th Cir. 1994)(upholding vulnerable-victim enhancement although the defendant's mental illness and emotional condition inhibited his ability to perceive the victim's particular vulnerability).

Here, Doe had long cared for Garcia and served as a maternal figure. See PSR ¶ 24, at 7. Had Garcia not known that Doe was particularly vulnerable at the precise moment he attacked her,

he should have known that a frail, eighty-six-year-old woman who relies on a cane to walk was particularly vulnerable to suffering from a physical attack with that cane. Notably, Garcia does not assert that his intoxication level negates his mens rea for the assault, see Plea Agreement ¶ 7, at 4, and nor could he, because assault is a general intent crime, see United States v. Pettigrew, 468 F.3d 626, 639 (10th Cir. 2006). Further, Garcia accepts responsibility for the assault, notwithstanding his intoxication. See PSR ¶ 7, at 24. Accordingly, the Court concludes that Garcia's intoxication does not preclude § 3A1.1(b)(1)'s application.

Similarly, Doe is particularly vulnerable. Garcia contends that the PSR relies only on Doe's age in proposing the § 3A1.1(b)(1) enhancement, and Garcia argues that the Court may not apply the enhancement based only on Doe belonging in a class that is generally considered vulnerable. See Objections at 4. Garcia is correct that the Court must make an individualized assessment that Doe is a particularly vulnerable victim. See, e.g., United States v. Proffit, 304 F.3d at 1007. "In assessing vulnerability, the sentencing court must make an individualized determination; it is not enough that a victim belongs to a class generally considered vulnerable." United States v. Scott, 529 F.3d at 1300-01.

The Tenth Circuit has concluded that a victim with cerebral palsy was particularly vulnerable to attack, because the victim was mostly paralyzed on one side and was unable to flee from his attacker. See United States v. Joe, 785 F. App'x at 530. The Tenth Circuit rejected the defendant's arguments that the defendant was intoxicated and suffered from a limp, holding that a defendant's physical and mental limitations because of intoxication do not "proscribe" § 3A1.1(b)(1)'s application. United States v. Joe, 785 F. App'x at 531. The Tenth Circuit has also approved of § 3A1.1(b)(1)'s application to a fifty-seven-year-old woman of slight build and

frail appearance who had recently undergone a double mastectomy.  <u>See</u> <u>United States v. Pearce</u>, 967 F.2d at 434-35.

Garcia focuses on the PSR's finding that, after the assault, Doe walked some 200 yards to find help.  <u>See</u> Objections at 4 (citing PSR ¶ 13, at 4).  The PSR does not provide whether Doe retrieved her cane and used it to walk the 200 yards.  <u>See</u> PSR ¶¶ 13-18, at 3-5 (providing that Doe was "ambulatory" when she arrived at the hospital).  The PSR provides, however, that Doe needed Garcia's brother's assistance in walking "through" a fence that blocked her way to the road.  PSR ¶ 14, at 4.  Further, that Garcia may not have injured Doe to the extent that she was unable to walk is not dispositive of § 3A1.1(b)(1)'s application.  <u>See</u>, <u>e.g.</u>, <u>United States v. Yount</u>, 960 F.2d 955, 957 (11th Cir. 1992)(affirming vulnerable-victim enhancement for embezzling funds from elderly clients' account even though a bank reimbursed the victims' funds).  Here, Doe was eighty-six years old at the time of the attack.  <u>See</u> PSR ¶ 20, at 6.  She suffers from several health conditions, including diabetes, cardiovascular diseases, osteoarthritis, and joint pain.  <u>See</u> Medical Record at 2-3, filed May 5, 2020 (Doc. 44-1).  She generally requires a cane to walk, and Garcia used that cane to severely beat Doe, limiting her ability to escape or defend herself.  <u>See</u> PSR ¶ 20, at 6. Further, district courts are to consider the totality of the circumstances in applying the vulnerable-victim enhancement.  <u>See</u> <u>United States v. Checora</u>, 175 F.3d at 789.  Although the vulnerable-victim enhancement directs that courts focus primarily on the victim's characteristics, size and age disparity between the defendant and the victim is relevant, because a greatly outmatched victim is more vulnerable.  <u>See</u> <u>United States v. Checora</u>, 175 F.3d at 789 (concluding that "the trial court was correct to consider this size disparity").  Garcia is five feet and eight inches tall, and weighs 210 pounds.  <u>See</u> PSR ¶ 59, at 14.  Doe weighs less than 150 pounds.  <u>See</u> Addendum at 1.  When Garcia assaulted Doe, he was twenty-seven years old and Doe was eighty-six years old.  <u>See</u> PSR

- 21 -

at 2 (providing that Garcia was born on December 28, 1991); id. ¶ 20, at 6.  Doe was thus greatly

outmatched, and when Garcia took her cane, he removed her ability to flee.  The Court thus

concludes that Garcia knew or should have known that Doe was particularly vulnerable to an

assault that used her cane to beat her.  The Court accordingly applies the 2-level enhancement

under U.S.S.G. § 3A1.1(b)(1) and overrules Garcia's Objection.

## II.   A SPECIAL CONDITION REQUIRING SEX-OFFENDER TREATMENT IS UNWARRANTED.

Garcia also objects to the PSR's recommendation that he undergo sex offender treatment

as a condition of his supervised release.  See Objections at 5.  Garcia contends that, where the

offense for which the defendant is being sentenced is not a sex crime, courts should impose sex

offender treatment conditions only where there is a nexus between the instant federal offense and

the prior sex offense.  See Objections at 5 (citing United States v. Dougan, 684 F.3d 1030, 1036-

37 (10th Cir. 2012)).   Garcia further asserts that sex offender treatment requirements are

unwarranted when the earlier sex crime occurred long ago.  See Objections at 5 (citing United

States v. Bear, 769 F.3d 1221 (10th Cir. 2014)).  Finally, Garcia argues that sex offender treatment

is unwarranted where the defendant already underwent treatment following the earlier sex crime.

See Objections at 5-6.  The USPO responds that it recommends the treatment requirement to

"assess risk and treatment needs the defendant may have upon release from custody."  Addendum

to the Presentence Report at 2, filed April 29, 2020 (Doc. 44)("Addendum").  The USPO contends

that Garcia's earlier abusive sexual contact conviction warrants the requirement to assess any risk

that Garcia "may or may not pose to the community."  Addendum at 2.  The United States points

to two statements by the emergency medical personnel and nurses who treated Doe, which state

that, although Doe did not report or state that Garcia sexually assaulted her, the personnel and

- 22 -

nurses thought that it was possible that he did, and requested a sexual assault examination.  See United States' Response to the Defendant's Objections to PSR at 3 (citing Gallup Indian Medical Center -- Discharge Summary at 1, filed May 5, 2020 (Doc. 45-4)("Discharge Summary")); Medical Record at 1.  The record does not show that an examination was ever conducted.  The Court agrees with Garcia that sex offender treatment is unwarranted.

The Court decided a similar issue in United States v. Mollohan, 41 F. Supp. 3d 1024 (D.N.M. 2014)(Browning, J.).  In that case, the PSR called for the defendant to undergo a psychosexual evaluation and participate in sex offender treatment upon release.  See 41 F. Supp. 3d at 1025.  The Court reviewed caselaw from the Tenth Circuit and other courts and found only one case where special sex-offender conditions for supervised release were upheld where the conviction was more than ten years old.  See 41 F. Supp. 3d at 1026.  In contrast, it cited cases from the United States Courts of Appeals for the First, Sixth, Eight, Ninth, and Tenth Circuits that found an abuse of discretion where district courts ordered such conditions of release.  See 41 F. Supp. 3d at 1025-26.  The Court concluded that it would not impose the condition of release, because "the majority of United States Courts of Appeals have found abuse of discretion in cases where the district court orders special sex-offender conditions of release based on sex offenses that are more than ten years old," and because there was no suggestion that the conduct for which the defendant was sentenced was in any way similar to his previous sex offense.  41 F. Supp. 3d at 1026.  See United States v. Bearden, No. 11-CR-0891-MV-001, 2015 WL 13651135, at *4 (D.N.M. 2015)(Vázquez, J.)(concluding that it would impose the requested conditions of supervised release, because a recent psychological exam showed that the defendant was likely to engage in future criminal sexual behavior).  Here, the earlier sex offense happened twelve years

ago when Garcia was a juvenile, and he has not committed any additional sexual crimes since 2008.  See PSR ¶¶ 41-46, at 11; Objections at 6.

The nurse and emergency medical personnel's statements give the Court pause.  The United States contends that a sex offense treatment is necessary "[d]ue to the concern for sexual assault of the victim and the Defendant's sexual abuse history."  Response at 4.  Although the Court may rely on hearsay statements at sentencing, the Due Process Clause of the Fifth Amendment to the Constitution of the United States of America requires that such statements bear "some minimal indicia of reliability."  United States v. Damato, 672 F.3d 832, 847 (10th Cir. 2012).  See United States v. Cook, 550 F.3d 1292, 1296 (10th Cir. 2008)("[T]he due process clause protects a defendant's right not to be sentenced on the basis of materially incorrect information").  While medical records typically bear indicia of reliability, see Fed. R. Evid. 803(4), the records on which the United States relies bear indicia of unreliability.  First, although not dispositive, the records reflect that Doe did not herself report sexual abuse.  See Discharge Report at 1.  Second, the records suggest that a sexual assault nurse examiner was called, but the record contains no evidence that a sexual assault examination was conducted.  The Court presumes that, were such an examination conducted, the United States would have so documented in the record.  Third, the records do not reflect the source of the nurses' suspicion.  See Medical Record at 1 (stating: "possibly allegations of sexual assault"); Discharge Report at 1.  Accordingly, there is minimal evidence that this offense involved sexual assault.  Accordingly, the Court concludes that the requested condition of supervised release would result in greater punishment than necessary.  The requested condition does not appear reasonably necessary to protect the public, prevent crime, and promote Garcia's rehabilitation, because Garcia has not committed any further sex crimes since his juvenile adjudication, more than ten years ago.  Because Garcia's current conduct is not similar

- 24 -

to his past sex offense, which occurred over ten years ago, the Court will sustain his objection to the PSR and will not impose the requested condition of supervised release.

### III.   THE COURT WILL PROHIBIT CONTACT WITH DOE ABSENT USPO APPROVAL AS A SPECIAL CONDITION OF SUPERVISED RELEASE.

Garcia next objects to the PSR's recommendation that the Court prohibit him from contacting Doe as a condition of his release.  See Objections at 8.  Garcia advances two primary arguments to support his Objection.  See Objections at 8-12.  First, Garcia contends that he has a fundamental right to associate with Doe, his grandmother, and compelling reasons must justify a no-contact order.  See Objections at 9.  Second, he argues that conditioning contact with Doe on USPO approval is an impermissible delegation of the Court's authority under Article III of the Constitution.  See Objections at 11.  The Court addresses each argument in turn.

#### A.   THE PROPOSED NO-CONTACT CONDITION DOES NOT IMPERMISSIBLY DELEGATE THE COURT'S AUTHORITY.

Before deciding the proposed condition's propriety, the Court considers whether requiring Garcia to obtain the USPO's approval before contacting Doe impermissibly delegates the Court's Article III authority to the USPO.  Garcia avers that Article III prohibits the Court from delegating a defendant's punishment to a probation officer.  See Objections at 11 (citing United States v. Mike, 632 F.3d 686 (10th Cir. 2011)).  Garcia notes that, in United States v. Mike, the Tenth Circuit held that a special condition delegating authority to a probation officer to determine whether the defendant should undergo psychiatric treatment, including whether to require the defendant to take psychotropic drugs, violated Article III.  See Objections at 11-12 (citing 632 F.3d at 692, 695).  Garcia contends that, where a special condition infringes upon a fundamental right, courts must be more vigilant in ensuring that they do not delegate punishment authority to the USPO.  See Objections at 12 (citing United States v. Bear, 769 F.3d at 1230.  Garcia avers that

- 25 -

his right to associate with Doe, his grandmother, is fundamental, and that the Court may not require the USPO to preapprove his contact with Doe.  See Objections at 12-13.

Federal probation officers operate under the federal judiciary's supervision and assist courts with determining and administering criminal punishments.  See, e.g., Probation and Pretrial Services - Mission, U.S. Courts, https://www.uscourts.gov/services-forms/probation-and-pretrial-services/probation-and-pretrial-services-mission (last visited May 6, 2020).  Article III power is not, however, vested in probation officers.  See Vermont v. New York, 417 U.S. 270, 277 (1974); United States v. Mike, 632 F.3d at 699-700.  The Constitution's Vesting Clause, Article III, § 1, provides: "The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."  U.S. Const. art. III, § 1.  The Supreme Court of the United States of America has interpreted the Vesting Clause to prohibit delegation of judicial power to non-judicial officers.  See N. Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 58–59 (1982)("The inexorable command of [Article III, § 1] is clear and definite: The judicial power of the United States must be exercised by courts having the attributes prescribed in Art. III.").  Accordingly, the Tenth Circuit has restricted district courts' abilities to delegate punishment decisions to the USPO.  See United States v. Mike, 632 F.3d at 695.

Nonetheless, the Tenth Circuit, like many Courts of Appeals, permits a degree of delegation to ensure the judiciary's smooth functioning.  See United States v. Mike, 632 F.3d at 692-95; United States v. York, 357 F.3d 14, 22 n.6 (1st Cir. 2004)("As a practical matter, moreover, many district courts must rely on probation services to ensure the efficient administration of justice in criminal cases."); United States v. Kent, 209 F.3d 1073, 1079 (8th Cir. 2000)("[F]ederal district courts cannot be expected to police every defendant to the extent that a

- 26 -

probation officer is capable of doing.").  Accordingly, the Tenth Circuit has adopted a limiting principle: "A court may delegate limited authority to a probation officer as long as the court retains and exercises ultimate authority over all of the supervised release conditions."  United States v. Wayne, 591 F.3d 1326, 1336 (10th Cir. 2010).  As a general matter, "probation officers have broad statutory authority to advise and supervise persons on supervised release to improve the releasees' conduct and lives, and to 'perform any other duty that the court may designate,'" including administering conditions "which require the prior approval of a probation officer."  United States v. Rodriguez, 558 F.3d 408, 414-15 (5th Cir. 2009)(quoting 18 U.S.C. §§ 3601, 3603(3), (10)).  Accord United States v. Mike, 632 F.3d at 695.  For example, regarding this proposed no-contact condition, the Court would retain the authority to modify this condition of supervised release under 18 U.S.C. § 3583(e)(2), should Garcia ever seek to modify the condition.  Under the relevant portions of 18 U.S.C. § 3583(e)(2), a court may:

> modify, reduce, or enlarge the conditions of supervised release, at any time prior to the expiration or termination of the term of supervised release, pursuant to the provisions of the Federal Rules of Criminal Procedure relating to the modification of probation and the provisions applicable to the initial setting of the terms and conditions of post-release supervision. . . .

18 U.S.C. § 3583(e)(2).  The United States Court of Appeals for the Eighth Circuit explained:

> Implicit in these decisions [to delegate authority to the USPO] is an assumption that where the district court does not disclaim ultimate responsibility . . . [and that] it is likely that the probation officer will consult with the court about the matter or, at a minimum, the court will entertain a motion from the defendant for reconsideration of the probation officer's initial decision.

United States v. Wynn, 553 F.3d 1114, 1120 (8th Cir. 2009).

No-contact orders are standard conditions of supervised release.  Section § 3563(b)(6) provides courts with the authority to restrict defendants' contact with their victims.  See 18 U.S.C. § 3563(b)(6) (providing that courts may court order that the defendant "refrain from . . . associating

unnecessarily with specified persons."). The Administrative Office and the USPO have long recommended that courts restrict defendants' contact with their victims as a condition of release. See U.S. Courts, Probation and Pretrial Services, "Overview of Probation and Supervised Release Conditions -- Chapter 3: Association and Contact Restrictions," available at https://www.uscourts.gov/services-forms/association-contact-restrictions-probation-supervised-release-conditions (last accessed May 6, 2020).

In order to satisfy the Vesting Clause, however, the Court must retain ultimate authority over even standard release conditions. In United States v. Cabral, 926 F.3d 687 (10th Cir. 2019), the Tenth Circuit reviewed a condition that allowed the USPO to require the defendant to notify third parties if the USPO determined that the defendant posed a risk to them. See 926 F.3d at 690. The Tenth Circuit noted that improper delegation occurs when a district court directs the USPO to go beyond ministerial functions and, instead, decide the nature and extent of the defendant's punishment. See 926 F.3d at 697. The Tenth Circuit asserted that this inquiry "turns on" the extent to which the USPO's decision affects a defendant's liberty interests. 926 F.3d at 697. The Tenth Circuit held that tasking the USPO with determining to whom the defendant posed a risk violates this test. See 926 F.3d at 697. The Tenth Circuit noted that the district judge "emphatically opened the door to boundless scenarios implicating various liberty interests" by refusing to specify what would constitute a risk requiring third-party notification. 926 F.3d at 697. The Tenth Circuit further noted that the condition could permit the USPO to require the defendant to notify his family members, thus impinging on his fundamental familial association interests. See 926 F.3d at 697. The Tenth Circuit accordingly held that delegations must specify clearly the USPO's task and remove USPO discretion to determine the nature and extent of the defendant's punishment. See 926 F.3d at 698. The Tenth Circuit focused exclusively on the fact that the district court did not

define "risk," 926 F.3d at 697-98, so the condition likely would have been permissible had the district court defined risk with specificity in such a way that did not interfere with the defendant's associational interests.

The Court concludes that the proposed condition, if written to direct that the USPO liberally approve contact if Doe consents to the contact and if Garcia generally complies with supervised release conditions, would not amount to an impermissible delegation of the Court's Article III authority. See United States v. White, 782 F.3d 1118, 1142 (10th Cir. 2015)(affirming a no-contact order requiring USPO approval for the defendant to visit his children, because the district court "provided guidance to the probation office about the exercise of its discretion when it informed the parties that approval should be granted unless [the defendant] poses a safety risk to children, and . . . the court expected the probation office would approve other family members as supervising adults."). The limited nature of this delegation -- the ability to disallow contact with one person, Doe, the victim of the crime, if Doe does not wish to see Garcia or if Garcia does not otherwise comply with the supervised release conditions -- limits the extent to which the condition restricts Garcia's associational interests. See United States v. Ceballos-Silva, No. 11-10275, 2011 WL 6217935, at *1 (5th Cir. Dec. 14, 2011)(unpublished)("The district court's delegation to the probation officer of its ability to implement and approve any exceptions to these restrictions [regarding contact with minors or the victims] did not constitute an abdication of its judicial authority."); United States v. Wayne, 591 F.3d at 1336 ("Because the district court retained the ultimate authority to require Ms. Wayne to undergo mental health counseling, this condition was not an improper delegation of judicial power."). Importantly, "Article III prohibits a judge from delegating the duty of imposing the defendant's punishment to the probation officer." United States v. Mike, 632 F.3d at 695. "In determining whether a particular delegation violates [the

Vesting Clause], courts distinguish between those delegations that merely task the probation officer with performing ministerial acts or support services related to the punishment imposed and those that allow the officer to decide the nature or extent of the defendant's punishment."  United States v. Mike, 632 F.3d at 695.

The USPO's role is primarily, if not exclusively, ministerial.  If Doe consents to contact and Garcia complies with the other supervised release conditions, the USPO should permit the contact.  If Doe does not consent and Garcia does not comply, the USPO should prohibit it.  The USPO makes the ministerial decision whether Doe has consented to contact and whether Garcia is complying with his supervised release conditions.  If the USPO does more than that ministerial role and starts denying contact for other reasons, it would go beyond the Court's intentions regarding this condition's potential imposition.  If that situation arises, Garcia may request that the Court modify the condition, and it will be inclined to do so and eliminate the USPO's ministerial role.  While the condition affects Garcia's liberty interests, the Court does not believe that the proposed condition "constitute[s] a greater deprivation of liberty than reasonably necessary to accomplish the goals of sentencing," particularly given the USPO's minimal ministerial role and the nature of Garcia's crime against the victim, Doe.  United States v. Mike, 632 F.3d at 696.  See United States v. White, 782 F.3d at 1142.  The Court will accordingly amend the Bruce Memo's recommendation to impose the following condition:  "You must not communicate, or otherwise interact, with the victim, either directly or through someone else without prior approval of the probation officer.  The probation officer shall grant approval provided that Doe consents and you comply with the other supervised release conditions."

**B.    THE NO-CONTACT CONDITION DOES NOT VIOLATE GARCIA'S SUBSTANTIVE DUE PROCESS RIGHTS.**

Garcia avers that the Fifth and Fourteenth Amendments to the Constitution protect his right to associate with his grandmother.  See Objections at 8-10.  Garcia cites United States v. LeCompte, 800 F.3d 1209 (10th Cir. 2015), and argues that, in that case, the Tenth Circuit reversed a supervised release revocation after the defendant violated a special condition that forbade contact with all children on a Sex Offender Registration and Notification Act, 18 U.S.C. § 2250, violation. See Objections at 9 (citing United States v. LeCompte, 800 F.3d at 1210).  The violation involved the defendant sitting outside his home with his girlfriend, her two-year-old daughter, and other family members.  See Objections at 9-10 (citing United States v. Lecompte, 800 F.3d at 1210). Garcia asserts that the Tenth Circuit reversed the revocation, because the special condition "'involv[ed] greater deprivation of liberty than is reasonably necessary for the purposes set forth in section 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D).'"  Objections at 9 (quoting United States v. Lecompte, 800 F.3d at 1216 (holding that the revocation did not further § 3553(a)'s policies of deterring crime, protecting the public, and promoting the defendant's rehabilitation)).  Garcia also asserts that the Tenth Circuit relied on the facts that the underlying sex offense that required sex offender registration occurred eleven years earlier and the defendant had not engaged in any further inappropriate sexual behavior.  See Objections at 10 (citing 800 F.3d at 1216).  Garcia contends that the "same deficiencies exist here," because Garcia "has not engaged in any additional inappropriate sexual behavior, his original offense did not involve a small child, relative, nor a male; the original offense is remote, and the condition is greater than necessary to . . . deter[] criminal activity, protect[] the public, and promot[e] rehabilitation."  Objections at 10.  The Court notes, however, that the USPO proposes the no-contact special condition, not because of Garcia's

- 31 -

earlier sex offense, but rather to protect Doe, the victim of the instant federal offense.  See Addendum at 2 ("This condition is imposed to avoid any reoccurrence of criminal activity similar to the instant offense.").

In United States v. Edgin, 92 F.3d 1044 (10th Cir. 1996), a defendant challenged the portion of a special condition of supervised release preventing him from contacting his son, but not the portion of the special condition prohibiting from contacting his son's mother or her boyfriend.  See 92 F.3d at 1048, 1050.  The Tenth Circuit emphasized that 18 U.S.C. § 3583(d)(2) requires conditions restricting a defendant's liberty to be "especially fine-tuned" to achieve the goals set forth in § 3553(a)(2)(B), (C), and (D) -- deter crime, protect the public, and promote the defendant's rehabilitation. United States v. Edgin, 92 F.3d at 1049.  The Tenth Circuit also held that the "special condition regarding Mr. Edgin's son implicates Mr. Edgin's liberty," because "a father has a fundamental liberty interest in maintaining his familial relationship with his son." United States v. Edgin, 92 F.3d at 1049 (citing Quilloin v. Walcott, 434 U.S. 246, 255 (1978)). The Tenth Circuit then remanded the case to the district court for further findings and to determine whether it should fine-tune the supervised release condition.  See United States v. Edgin, 92 F.3d at 1050.  In United States v. Smith, 606 F.3d 1270 (10th Cir. 2010), the Tenth Circuit analyzed the imposition of a similar special condition.  There, a defendant challenged the imposition of a condition barring him from contact with children and disabled adults.  See United States v. Smith, 606 F.3d at 1282. The Tenth Circuit held that the Honorable M. Christina Armijo, then-United States District Court Judge for the United States District Court for the District of New Mexico, did not abuse her discretion when she imposed that condition, because she considered the defendant's rape of a sleeping woman to be a sexual attack on a vulnerable person.  See United States v. Smith, 606 F.3d at 1283.  The Tenth Circuit noted, however, that the condition could be read to prohibit

- 32 -

the defendant's contact with his own minor child and that "special conditions that interfere with the right of familial association can do so only in compelling circumstances." United States v. Smith, 606 F.3d at 1283. While the Tenth Circuit recognized that "Smith has demonstrated a willingness and ability to prey on vulnerable individuals," it pointed out that "the record does not unambiguously support a finding that Smith is a danger to his own child or minor siblings." United States v. Smith, 606 F.3d at 1283. Although the Tenth Circuit affirmed Judge Armijo's imposition of the condition, it remanded for further proceedings as to whether the scope of the special condition included the defendant's own children. See United States v. Smith, 606 F.3d at 1284.

In United States v. Mike, the Tenth Circuit again analyzed the imposition of special conditions of supervised release. The Tenth Circuit emphasized the defendant's psycho-sexual evaluations to support the imposition of certain sex-offense special conditions. See United States v. Mike, 632 F.3d at 694. There, the Tenth Circuit recognized that conditions that touch on significant liberty interests are "qualitatively different from those that do not." United States v. Mike, 632 F.3d at 695 (citing United States v. Stoterau, 524 F.3d 988, 1005-06 (9th Cir. 2008)). Finally, in United States v. Bear, the Tenth Circuit addressed a no-contact special condition involving a defendant who, almost ten years before the federal offense, forced two children to engage in sexual acts with him. See 769 F.3d at 1225. The federal offense involved the defendant's failure to register as a sex offender after he moved to Oklahoma City. See 769 F.3d at 1225. The district court required, as a condition of the defendant's supervised release, that the defendant avoid associating with any children under the age of eighteen "except in the presence of a responsible adult who is aware of the defendant's background and current offense, and who has been approved by the U.S. Probation Officer." 769 F.3d at 1225. The Tenth Circuit held that this condition imposed greater restrictions than necessary to deter criminal activity, protect the public,

and promote the defendant's rehabilitation to the extent that the condition restricted the defendant's ability to associate with his own children.  See 769 F.3d at 1229.  The Tenth Circuit noted that, when a defendant is convicted of sexual crimes against children, general restrictions on the defendant's ability to associate with children are permissible, but the Tenth Circuit will subject restrictions on a defendant's right to associate with his or her own children to stricter review.  See 769 F.3d at 1229.  The Tenth Circuit held that the special condition violated the defendant's liberty interests in associating with his children, because the initial sex offense was remote in time, the defendant had not continued to pursue deviant sexual interests, and there was no evidence that the defendant posed a danger to his own children.  See 769 F.3d at 1229.

The Court concludes that the proposed condition comports with the Tenth Circuit's test from United States v. Mike, 632 F.3d at 692.  First, the condition is reasonably related to the federal offense's "nature and circumstances," Garcia's "history and characteristics," the need to protect Doe, and promoting Garcia's rehabilitation.  United States v. Mike, 632 F.3d at 692.  The proposed condition restricts Garcia from free rein in visiting Doe, this offense's victim, and so relates to the instant offense and protects Doe.  Further, Garcia committed this offense while extremely intoxicated -- Garcia indicates that alcohol was a predominate factor in causing him to assault Doe, see PSR ¶ 27, at 4 -- and the special condition directs USPO to ensure that Garcia has not resumed drinking as a condition of seeing Doe.  Accordingly, the special condition helps to prevent the circumstances that led Garcia to this point and thus prevents the offense's recurrence and promotes Garcia's rehabilitation.

Second, the proposed condition involves no greater deprivation of Garcia's liberty than is reasonably necessary to deter crime, protect the public, and promote Garcia's rehabilitation.  See United States v. Mike, 632 F.3d at 692.  Garcia is correct that he has an important liberty interest

in associating with his grandmother.  See Suasnavas v. Stover, 196 F. App'x 647, 657 (10th Cir. 2006)(unpublished)(citing Moore v. City of East Cleveland, 431 U.S. 494 (1977)(plurality opinion)).  The proposed special condition would not, however, impermissibly infringe upon that interest.  The proposed order restricts Garcia ability to visit with one person and directs the USPO to liberally approve visits provided that Doe consents and Garcia complies with the other supervised release conditions.  This protects Doe, deters Garcia from future criminal activity, and promotes Garcia's rehabilitation.

Third, the proposed condition is consistent with the pertinent statutory and Guidelines policy statements.  See United States v. Mike, 632 F.3d at 692.  In United States v. Bear, the Tenth Circuit concluded that § 3582(d) does not require that conditions be "expressly covered by policy statements," but rather that the conditions "not directly conflict with the policy statements."  769 F.3d at 1231.  The Tenth Circuit approved of considering the § 3553(a) factors as policy guideposts.  See United States v. Bear, 769 F.3d at 1231.  Garcia does not identify any particular policy statements that discourage the proposed condition.  See Objections at 9-13.  Further, statutory policy expressly envisions limitations on defendants' contact with victims.  See 18 U.S.C. §§ 3563(c), 3583(e)(2), (h).  Finally, the proposed condition "comports with the relevant constitutional provisions."  United States v. Mike, 632 F.3d at 692.  As discussed, the proposed condition does not delegate judicial functions to the USPO and does not restrict Garcia's liberty any more than is necessary to deter crime, protect the public, and promote Garcia's rehabilitation.  Accordingly, the Court overrules Garcia's Objection, and imposes as a special condition the following: Garcia must not communicate or otherwise interact with the victim, either directly or through someone else, without the probation officer's prior approval.  The probation officer shall

approve each requested contact, provided that the victim consents to the contact and Garcia complies with the other conditions of his supervised release.

## IV.  THE COURT WILL REQUIRE GARCIA TO LIVE AT A HALFWAY HOUSE AS A CONDITION OF SUPERVISED RELEASE.

Garcia next objects to the PSR's recommendation that the Court require him to live at a halfway house for six months following his release from prison.  See Objections at 13.  Garcia avers that he will likely "spend the last months of his sentence at a halfway house," and so an extra six months will not serve any meaningful purpose.  Objections at 13.  Garcia says that the thought of living in a big city like Albuquerque intimidates him, as he has lived his entire life in rural areas.  See Objections at 13.  Garcia also says that Doe does not live in Pine Hill, New Mexico, to which he will return after incarceration, but rather at a nursing home in Gallup, New Mexico.  See Objections at 13.  The USPO seeks to justify the recommendation by stating that Garcia did not provide the USPO with an address to which he would return after incarceration, and because Garcia did not give USPO his brother's contact information, the USPO cannot schedule a home visit to assess Garcia's potential living situation.  See Addendum at 2.  The United States avers that the Court should require that Garcia stay at a halfway house, because he has "not provided a viable alternative solution" as to where he will live when he is released from prison.  Response at 6.

"Section 3583(d), in conjunction with 18 U.S.C. § 3563(b)(11), allows commitment to a community corrections facility to be a condition of supervised release."  United States v. Woolsey, 606 F. App'x 454, 458 (10th Cir. 2015)(unpublished).  The Guidelines also enable halfway house commitment as a condition of supervised release.  See U.S.S.G. § 5D1.3(e)(1).  As with the no-contact order discussed above, the decision to commit a defendant to a halfway house must be reasonably tailored to further §§ 3553(a) and 3583(d)(2)'s policies of protecting the public,

- 36 -

deterring crime, and promoting the defendant's rehabilitation.  See United States v. Mike, 632 F.3d at 692.

The Court concludes that commitment to a halfway house is necessary to protect the public, deter Garcia from future crime, and promote Garcia's rehabilitation.  Garcia has stayed at halfway houses before, see PSR ¶ 53, at 13, at which he fared poorly, see PSR ¶ 40, at 10-11.  Garcia has problems with drinking, a major factor in the instant offense, and has struggled with mental health problems.  See PSR ¶¶ 64-105, at 14-23.  Additionally, the PSR notes significant family struggles, often leading to violence, that may be a bad influence on Garcia as he transitions from imprisonment to freedom.  See PSR ¶ 54, at 13; Supplemental Police Report at 2-5 (dated November 12, 2016), filed May 5, 2020 (Doc. 45-3).  Finally, although the Court understands Garcia's reservations about living in an unfamiliar, urban environment, Garcia has not provided the USPO with an alternative residence or his brother's contact information so the USPO can schedule a visit to ensure that, should he stay with his brother, he will be in a suitable environment.  See Addendum at 2.  The PSR also indicates that Garcia has no financial assets or stable employment history, which raises doubts as to Garcia's ability to afford his own living arrangement.  See PSR ¶¶ 111-113, at 27.  The Court is thus concerned that Garcia may not have a suitable living situation in Pine Hill immediately after his release at which he can receive the care and supervision he needs.  Requiring Garcia to stay at a halfway house will promote Garcia's rehabilitation by ensuring he has access to the care and guidance he needs and protect the public and deter crime by placing Garcia under further supervision as he transitions out of prison.

V.    **A PREPONDERANCE OF THE EVIDENCE ESTABLISHES THAT THE
      <u>ASSAULT DID NOT CAUSE DOE'S UNEQUAL HUMERUS BONES</u>.**

Garcia last objects to the PSR's finding that Doe's unequal humerus bones are attributable

to Garcia's assault.  <u>See</u> Objections at 14.  Garcia contends that aging, not Garcia's assault, caused

Doe's humerus injury.  <u>See</u> Objections at 14.  The USPO responds that this finding "was derived

directly from medical records within discovery and will remain in the PSR."  Addendum at 2.  The

United States concedes that Garcia's assault likely did not cause Doe's humerus bones to be

unequal.  <u>See</u> Response at 6.  The Court agrees with Garcia and the United States that a

preponderance of the evidence does not establish Doe's humerus bone condition is attributable to

the assault.  Doe's medical records provide that an X-ray showed mineralization on one of Doe's

humerus bones but that there was no indication of fracture or dislocation.  <u>See</u> Objections at 14.

The records do not attribute the mineralization to the assault.  <u>See</u> Response at 14.  Accordingly,

the Court concludes that a preponderance of the evidence shows that Garcia's assault did not cause

Doe's humerus condition.  The Court directs that the PSR be amended to reflect this fact.

**IT IS ORDERED** that Defendant EZ Garcia's Objections to PSR, filed April 27, 2020

(Doc. 42), is sustained in part and overruled in part.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

John C. Anderson
   United States Attorney
Elisa C. Dimas
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

- 38 -

Kari Converse
  Federal Public Defender
Albuquerque, New Mexico

*Attorney for the Defendant*